[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION MOTION FOR SUMMARY JUDGMENT
CT Page 11144
On December 27, 1994, the plaintiff, New England Variety Distributors, Inc., doing business as Acme Automated Sales, filed a six count complaint against the defendants, Alarm Security Protection Company, Inc. ("ASP") and its president, Burdett C. Spiegel, seeking to recover damages sustained as the result of a burglary. Against both ASP and Spiegel, the plaintiff alleges negligence (count one), fraud and misrepresentation (count four), gross negligence and willful and wanton misconduct (count five), and violation of General Statutes § 42-110a et seq., the Connecticut Unfair Trade Practices Act ("CUTPA") (count six). Two counts are directed against ASP only: breach of contract (count two) and product liability pursuant to General Statutes §52-572m et seq. (count three).
Presently before the court is the defendants' amended motion for summary judgment, which was filed on March 21, 1998 with a supporting memorandum. An original and corrected version of the motion with accompanying memoranda were filed on May 30, 1996 and July 8, 1996, respectively. These versions of the motion were directed against counts one, two and three on the ground that the liquidated damages clause of the contract barred any claims derived from the contract. The plaintiff filed its original memorandum in opposition on April 2, 1997. The defendants' amended motion for summary judgment is directed against all counts of the complaint on the ground that there is no question of material fact and that the defendants' actions were not a proximate cause of the plaintiff's injuries. The plaintiff filed a memorandum in opposition to the amended motion on May 8, 1998.
 I.
The plaintiff is the owner of a warehouse located in Niantic, Connecticut. He entered into two contracts with ASP. The first contract, dated January 28, 1991, entitled "Lease and Service Agreement," provides for the sale and installation of certain detection devices constituting a burglar alarm system as well as off-premises monitoring services. (Defendants' Exhibit G.) The second contract, dated February 7, 1991, entitled "Sales Contract," provides for the sale of a cellular phone system that would interface with the burglar alarm when the regular phone line is out of service. (Defendants' Exhibit H.) Both contracts provide for liquidated damages in the amount of "ten percent (10%) of the annual service charge or $250, whichever is CT Page 11145 greater. . ." (Defendants' Exhibit G, ¶ 14.)
On December 23, 1992, there was an illegal entry into the plaintiff's premises. (Engelman affidavit, dated April 10, 1997, ¶ 10.) The detection system installed by ASP, however, failed to detect the intrusion or to signal any type of alarm. (Engelman affidavit, ¶¶ 10 and 11.)
The gravamen of the plaintiff's complaint is that the defendants induced the plaintiff to purchase the alarm system with misleading information as to its functional quality, and the system did not operate as represented.
 II.
"Summary judgment is a method of resolving litigation when pleadings, affidavits, and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . The motion for summary judgment is designed to eliminate the delay and expense of litigating an issue when there is no real issue to be tried." (Citations omitted.) Wilson v. New Haven,213 Conn. 277, 279, 567 A.2d 829 (1989). "[S]ummary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The party seeking summary judgment has the burden of showing the absence of any genuine issue as to all the material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . The test is whether a party would be entitled to a directed verdict on the same facts." (Citations omitted; internal quotation marks omitted.) Suarez v.Dickmont Plastics Corp. , 229 Conn. 99, 105-06, 639 A.2d 507
(1994).
 A. Counts One, Two, and Three
The defendants argue that the liquidated damage clauses in CT Page 11146 the contracts, which provide for liquidated damages in the amount of "10% of the annual service charge, or $250, whichever is greater," are applicable to the causes of action set forth in the first, second and third counts of the complaint. Paragraph 14 of the "Lease and Service Agreement," which contains language identical to that in the "Sales Contract," provides in pertinent part:
 14. It is understood and agreed by and between the parties hereto that the CONTRACTOR [ASP] is not an insurer. Insurance, if any, will be obtained by the SUBSCRIBER [the plaintiff]. Charges are based solely upon the value of the services provided for and are unrelated to the value of SUBSCRIBER'S property or the property of others located in SUBSCRIBER'S premises. The amounts payable by the SUBSCRIBER are not sufficient to warrant the CONTRACTOR assuming any risk of consequential or other damages to the SUBSCRIBER due to the CONTRACTOR'S negligence or failure to perform, including but not limited to loss or damage which may be occasioned by or caused by the improper working of any equipment or connecting circuit or by or because of the failure of an alarm to be received at the Central Station, or by or because of the failure to notify the police or fire department pursuant to instruction of or agreement with the SUBSCRIBER or by or because of any delay in or failure to dispatch an agent to the premises to investigate an alarm.
 The SUBSCRIBER does not desire this contract to provide for liability of the CONTRACTOR and SUBSCRIBER agrees that the CONTRACTOR shall not be liable for loss or damage due directly or indirectly to any occurrence or consequences therefrom, which the service is designed to detect or avert. It is impractical and extremely difficult to fix the actual damages, if any, which may proximately result from the failure on the part of the CONTRACTOR to perform any of its obligations herein, or in the failure of the system to properly operate with a resulting loss to the SUBSCRIBER. In the event the CONTRACTOR should be found liable for loss or damage due to a failure on the part of the CONTRACTOR or its system, in any respect, this liability shall be limited to the sum of ten percent (10%) of the annual service charge or $250, whichever is greater, as liquidated damages, and not as a penalty, and this liability shall be exclusive. The provisions of this paragraph shall apply in the event of loss or damage, CT Page 11147 irrespective of cause or origin, results directly or indirectly to person or property from the performance or non-performance of the obligations set forth by the terms of this Agreement or from negligence, active or otherwise, from the CONTRACTOR, its agents or employees.
Paragraph 14 concludes by stating that if the SUBSCRIBER wishes the CONTRACTOR to assume greater liability than the above, the SUBSCRIBER could obtain a higher limit by paying an additional amount to the CONTRACTOR.
"[A] contractual provision fixing the amount of damages to be paid in the event of a breach is enforceable if it satisfies certain conditions . . . (1) The damage which was to be expected as a result of a breach of the contract was uncertain in amount or difficult to prove; (2) there was an intent on the part of the parties to liquidate damages in advance; and (3) the amount stipulated was reasonable in the sense that it was not greatly disproportionate to the amount of the damage which, as the parties looked forward, seemed to be the presumable loss which would be sustained by the contracted in the event of a breach of the contract." (Citations omitted.) Berger v. Shanahan,142 Conn. 726, 731-32, 118 A.2d 311 (1955).
Connecticut Superior Courts have granted summary judgment for defendant alarm companies in similar cases, on the ground that liquidated damage provisions in fire and theft alarm installation, testing and monitoring agreements, containing language that is virtually identical to the language in the present contracts, are valid and enforceable.[1]
"It is not illegal for a party to a contract to limit his liability in damages for nonperformance of his promises, although such a provision is not effective in case he acts fraudulently or in bad faith." 6A A. Corbin, Contracts (1962) § 1472, p. 606. Cf. 5 R. Anderson, Anderson on the Uniform Commercial Code (3d Ed. 1994) § 2-721:88, p. 177 (limitation on the remedies of the buyer not binding when the contract has been induced by fraud). "Thus, the defendant cannot . . . rely on the [limitation of liability] provisions of a contract which was entered into as a result of fraudulent actions on defendant's part." AmericanElectric Power Co. v. Westinghouse Electric Corp. , 418 F. Sup. 435,460 (S.D.N.Y. 1976).
In the present case, the defendants have proffered evidence CT Page 11148 demonstrating that the parties had an agreement under which they would install a local alarm system to include an "external alarm" on the side of the plaintiff's warehouse, "`electronic contacts' on the three entrance-ways, along with motion and infrared detectors to detect intruders," and "off-premises central station monitoring via a digital communicator." In addition, the defendants agreed "to install a cellular telephone system designed to interface with the burglar alarm system to transmit any alarms from the system when the regular telephone is out of service." The defendant asserts that the system "was installed in precise conformity with the written contracts." (Spiegel affidavit, ¶¶ 3, 4 and 6.)
The plaintiff, however, has made claims of fraudulent inducement and gross negligence in counts four and five, and has submitted an affidavit incorporating these allegations. "The defendants represented . . . that the new system installed by the defendants would include a telephone cut monitor, which would sound the alarm bell if the telephone line was cut, and would provide the appropriate signal to the monitoring service. . . The defendants further represented . . . that the system installed . . . would include a dedicated line system. . . After the plaintiff's loss, the plaintiff discovered that the representations set forth above were false and, in particular, that the monitoring system which the defendants represented had been installed on the plaintiff's premises had not, in fact, been installed and was not even available in the area of the plaintiff's business." (Count 4, ¶¶ 5-7; Engelman affidavit, ¶ 13.)
"[S]ummary judgment procedure is particularly inappropriate where the inferences which the parties seek to have drawn deal with questions of motive, intent and subjective feelings and reactions." (Internal quotation marks omitted.) Suarez v.Dickmont Plastics Corp., supra, 229 Conn. 111. The foregoing contradictory affidavits create a question of material fact as to motive and intent and the nature of the representations made by the defendant. The defendant has not, therefore, met its burden of showing the absence of any genuine issue of material fact which, under applicable principles of substantive law, entitle it to judgment as a matter of law.
Accordingly, since there are substantial issues of material fact relating to the validity of the contract containing the liquidated damages provision, the motion for summary judgment on CT Page 11149 counts one, two, and three is denied.
 B. Count Three
The defendant also seeks summary judgment on count three on the alternative ground that it is not a "product seller" as defined by General Statutes § 52-572m(a),[2] and therefore, not subject to liability under General Statutes § 52-572m et seq. It claims that it is in the business of designing, installing, servicing and monitoring security systems, and that these systems are not mass produced or mass marketed, each one being unique to its location. (Spiegel affidavit, ¶¶ 9 and 10.) It argues that these activities are properly characterized as "services" rather than "sales."
The plaintiff argues that the transaction was made up of both a "sales contract" and a "lease and service agreement," with the service aspects of the agreement only incidental to the sale of a product. It also argues that it is a mixed question of law and fact, and material questions of fact remain as to the nature of the transaction.
The Connecticut Product Liability Act ("CPLA") requires that a product liability claim be brought only against "product sellers." General Statutes 52-572n(a). A "`product seller' means any person or entity, including a manufacturer, wholesaler, distributor or retailer who is engaged in the business of selling products . . ." General Statutes 52-572n(a). A manufacturer is one who designs, assembles, fabricates, constructs, processes, packages or otherwise prepares a product prior to its sale to a user. General Statutes 52-572m(e). Whether the defendant is a "product seller" is a question of law for the court to determine. See Burkert v. Petrol Plus of Naugatuck, Inc., 216 Conn. 65, 72,579 A.2d 26 (1990). "To maintain a product liability action under § 52-572m et seq., the plaintiff must establish and prove, inter alia, that . . . the defendant was engaged in the business of selling the product. . . ." (Emphasis omitted; internal quotation marks omitted.) Zichichi v. Middlesex MemorialHospital, 204 Conn. 399, 403, 528 A.2d 805 (1987). "Once a particular transaction is labeled a `service', as opposed to a `sale' of a `product,' it is outside the purview of our product liability statute." Id.
CT Page 11150
The defendant contracted with the plaintiff to install an alarm system in its warehouse. The defendants claim that this was the provision of a service rather than the sale of a product. The CPLA does not define the term "product". Courts have defined it as "any item, thing, or commodity which, upon acquiring its physical existence and identity, through the process of manufacture or otherwise, is put in the stream of commerce either by sale, for use, consumption or resale or by lease or bailment."Bobryk v. Lincoln Amusements, Inc., Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 54708 (January 5, 1996, Sheldon, J.) (15 CONN. L. RPTR. 617, 619), and as "an object possessing intrinsic value, capable of delivery either as an assembled whole or as a component part or parts, and produced for introduction into trade or commerce," the definition from the Model Uniform Product Liability Act. Dumitrie v. Fernap,Inc., Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 288824 (April 25, 1994, Pittman, J.) (11 CONN. L. RPTR. 449, 450).
When distinguishing between a service and a product, some courts focus on the object of the contract. See Paul v. McPheeElectrical Contractors, 46 Conn. App. 18, 23, 698 A.2d 354 (1997) (holding that an electrician who installed a light fixture was not a product seller under the CPLA since there was no indication that the electrician was "involved in placing light fixtures into the stream of commerce"); Gilbane Building Co. v. StamfordTowers, Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. 118788 (August 31, 1995, D'Andrea. J.) (holding that a construction manager was not a product seller of allegedly defective precast panels where sufficient facts were not alleged to demonstrate that the construction manager was in the business of selling precast panels); Ferguson v. EBI MedicalSystems, Superior Court, judicial district of New London, Docket No. 527663 (August 1, 1995, Hurley, J.) (15 CONN. L. RPTR. 94) (holding that a hospital rendered services, and was not a product seller, where the hospital ordered and installed an allegedly defective wrist fixator during surgery on the plaintiff, since the contract was basically one for the rendition of services and the materials used were merely incidental to the main purpose of the contract); Hines v. JMJ Construction Co., Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 506329 (January 11, 1993, Miano, J.) (8 CONN. L. RPTR. 232) (holding that a subcontractor who constructed a sidewalk performed services). CT Page 11151
The defendant in this case is engaged in the leasing, maintenance and monitoring of alarm system equipment. It provides both a product and a service. "The Product Liability Act . . . does not give clear guidance as to how this hybrid sales-service transaction is to be labeled." In re Bridgeport AsbestosLitigation v. All Cases, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. [none] (June 24, 1998, Thim, J.) (22 CONN. L. RPTR. 391, 392). Whether the sale of a product was the object of the transaction raises factual issues.
Accordingly, the motion for summary judgment on count three is denied on this ground also.
 C. Proximate cause
The defendant raises the question of proximate cause in the alternative, seeking summary judgment on the entire complaint on the ground that the alarm system which the defendant installed was not the proximate cause of the plaintiff's alleged damages. The defendant relies on Vastola v. Connecticut ProtectiveServices, Inc., 133 Conn. 18, 47 A.2d 844 (1946), in which the court wrote: "The defendant's undertaking was to install a proper burglar alarm system which would, under the circumstances of this case, cause a bell over the entrance door to ring. It did not agree to afford further protection. In Nirdlinger v. AmericanDistrict Telegraph Co., 245 Pa. 453, 91 A. 883, a similar action for damages caused by the defendant's negligence, the defendant undertook to equip the plaintiff's house with a burglar alarm and to protect it from burglarious entry by the dispatch of guards thereto when warned by automatic signals. One of the issues discussed is whether a ringing of the alarm would have prevented the loss. The court said (p. 460): `But this is pure speculation. Whether that would have been the result had the apparatus been in working order can never be known. It would depend upon contingencies without number, any one of which would have been sufficient to disappoint it. Certainly there is nothing in the case from which a legal inference could be derived that the loss would have been averted had the electrical alarm been in order.'"Vastola v. Connecticut Protective Services, Inc., supra,133 Conn. 21-22. See also Ligouri v. Quintans, Superior Court, judicial district of Fairfield, Docket No. 318583 (June 13, 1996, Levin, J.) (17 CONN. L. RPTR. 218) (following Vastola). CT Page 11152
While the rule of Vastola v. Connecticut Protective Services,Inc., supra, 133 Conn. 21-22, remains relevant, the question of proximate cause in this case raises a number of factual issues that cannot be decided at this point in the litigation.[3] See generally Lodge v. Arett Sales Corp. , 246 Conn. 563, 581-2, 585
(1998) (holding that liability is inappropriate for the unforeseen consequences of a false alarm where imposing liability on the defendants would achieve little in preventing the type of harm suffered by the plaintiffs but leaving the door open for "a case where the harm and the negligence are less attenuated or where the benefits of imposing liability are more substantial"); Burns v. Gleason Plant Security, Inc.,10 Conn. App. 480, 485, 523 A.2d 940 (1987) (stating that proximate cause is usually a question of fact but becomes a question of law "when the mind of a fair and reasonable man could reach only one conclusion"). Viewing the facts in the light most favorable to the plaintiff, the court rejects the defendants' argument that Vastola is dispositive on the issue of proximate cause.
Accordingly, the motion for summary judgment is denied.
Peck, J.